IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GENESIS SANTIAGO,

    Plaintiff,                      No. CIV S-04-2481 WBS GGH

    vs.

JO ANNE B. BARNHART,           FINDINGS AND RECOMMENDATIONS
Commissioner of
Social Security,

    Defendants.
_____/

        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Titles II of the Social Security Act ("Act"). For the reasons that follow, the court recommends that Plaintiff's Motion for Summary Judgment or Remand be granted in part, the Commissioner's Cross Motion for Summary Judgment be denied, and that the Clerk be directed to enter judgment for the plaintiff. This matter should be remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further findings in accordance with these findings and recommendations.

BACKGROUND

        Plaintiff, born November 3, 1961, applied on August 16, 2002, for disability benefits. (Tr. at 97.) Plaintiff alleged he was unable to work since September 29, 2001 due to a

stiff right knee after surgery. (<u>Id.</u> at 97, 134.) In a decision dated September 24, 2003, ALJ James N. Baker determined plaintiff was not disabled. The ALJ made the following findings:[1]

    1.    The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

    2.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

    3.    The claimant's arthritis and coccidioidomycosis of the right knee is a severe impairment, based upon the requirements in the Regulations (20 CFR § 404.1521).

    4.    This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

\\\\\

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. <u>See</u> 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:

    Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

    Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.

    Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.

    Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.

    Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

    The claimant bears the burden of proof in the first four steps of the sequential evaluation process. <u>Bowen</u>, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. <u>Id</u>.

|   |   |   |
|---|---|---|
| 1 | 5. | The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision. |
| 2 | | |
| 3 | 6. | The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairment (20 CFR § 404.1527). |
| 4 | | |
| 5 | 7. | The claimant has the following residual functional capacity: standing and walking 2 hours in an eight-hour day, sitting 6 hours in an eight-hour day, and lifting and carrying 20 pounds occasionally and 10 pounds frequently. He cannot kneel or crawl and can only occasionally climb, balance, stoop, and crouch. |
| 6 | | |
| 7 | | |
| 8 | | |
| | 8. | The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565). |
| 9 | | |
| 10 | 9. | The claimant is a "younger individual" (20 CFR § 404.1563). |
| 11 | | |
| | 10. | The claimant has a "high school (or high school equivalent) education" (20 CFR § 404.1564). |
| 12 | | |
| 13 | 11. | The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 404.1568). |
| 14 | | |
| 15 | 12. | The claimant has the residual functional capacity to perform a full range of sedentary work (20 CFR § 404.1567). |
| 16 | | |
| 17 | 13. | Based on an exertional capacity for sedentary work, and the claimant's age, education, and work experience, a finding of "not disabled" is directed by Medical-Vocational Rule 201.25. |
| 18 | | |
| 19 | | |
| | 14. | The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(f)). |
| 20 | | |
| 21 | | |

(Tr. at 24-25.)

ISSUES PRESENTED

Plaintiff has raised the following issues: A. Whether the ALJ Failed to Obtain Additional Medical Analysis Prior to Finding that Plaintiff Was Not Disabled; and B. Whether the ALJ Properly Found Plaintiff Not Credible.

3

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 402, 91 S. Ct. 1420 (1971), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206 (1938). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).

ANALYSIS

Whether the ALJ Failed to Develop the Record

Disability hearings are not adversarial. Dixon v. Heckler, 811 F.2d 506, 510 (10th Cir. 1987) (holding that ALJ has basic duty to "inform himself about facts relevant to his decision") (quoting Heckler v. Campbell, 461 U.S. 458, 471 n.1 (1983) (Brennan, J., concurring)). The ALJ must fully and fairly develop the record, and when a claimant is not represented by counsel, an ALJ must be "especially diligent in exploring for all relevant facts." Tonapetyan v. Halter, 242 F.3d 1144 (9th Cir. 2001).[2] The duty also is heightened in the case of a mentally ill claimant who may not be able to protect him or herself. Id.

Evidence raising an issue requiring the ALJ to investigate further depends on the case. Generally, there must be some objective evidence suggesting a condition which could have

---

[2] See also Crane v. Shalala, 76 F.3d 251, 255 (9th Cir.1996) (ALJ has duty to develop the record even when claimant is represented).

a material impact on the disability decision.  See Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir.1996); Wainwright v. Secretary of Health and Human Services, 939 F.2d 680, 682 (9th Cir.1991).  "Ambiguous evidence . . . triggers the ALJ's duty to 'conduct an appropriate inquiry.'"  Tonapetyan, 242 F.3d at 1150 (quoting Smolen, 80 F.3d at 1288.)

The ALJ's duty continues  "when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence."  Mayes v. Massanari, 276 F.3d 453, 459-460 (9th Cir.2001).  Significant gaps in the record cannot simply be ignored.

The ALJ can develop the record by (1) making a reasonable attempt to obtain medical evidence from the claimant's treating sources, (2) ordering a consultative examination when the medical evidence is incomplete or unclear and undermines ability to resolve the disability issue; (3) subpoenaing or submitting questions to the claimant's physicians; (4) continuing the hearing; or (5) keeping the record open for supplementation.  See Tonapetyan, 242 F.3d. at 1150; 20 C.F.R. 404.1517, 416.917; 42 U.S.C. § 423(d)(5)(A), (B).  Ordering a consultative examination ordinarily is discretionary, see Wren v. Sullivan, 925 F.2d 123, 128 (5th Cir.1991); Jones v. Bowen, 829 F.2d 524, 526 (5th Cir.1987), and is required only when necessary to resolve the disability issue.  See Reeves v. Heckler, 734 F.2d 519, 522 (11th Cir.1984); Turner v. Califano, 563 F.2d 669, 671 (5th Cir.1977).

Plaintiff's knee problems began in 1995 when he had an abscess in his right knee which was diagnosed as coccidioidomycosis, a fungal infection also known as valley fever.  The Merck Manual 162-63 (16th ed. 1992).  (Tr. at 375.)  This infection returned in 2001.

On September 28, 2001, while plaintiff was examined at the Stockton Orthopedic Medical Group, the physician heard a loud pop in plaintiff's knee during extension. (Tr. at 197.) It caused significant pain.  Plaintiff reported the pop occurs frequently.  (Id.)

On October 18, 2001, after receiving treatment in the form of Fluconazole for four weeks, which plaintiff tolerated well, swelling and tenderness in the knee decreased, and plaintiff experienced increased movement.  (Tr. at 248.)

5

1       On November 13, 2001, Dr. Crooks, an orthopedist, completed a form for the
2 Employment Development Department. He stated that plaintiff could not work as of September
3 28, 2001. (Tr. at 289.) He predicted the disability would end on February 11, 2002. (Id.)
4       CT scan and MRI of the right femur and right knee on December 17, 2001,
5 indicated "bone destruction involving the posterior aspects of the medial femoral condyle which
6 is consistent with a focus of osteomyelitis associated with coccidioidomycosis. (Tr. at 284-86.)
7 There was an area of probable healed osteomyelitis and osteochondral defect with degenerative
8 arthritis "along the weight-bearing aspects of the medial femoral condyle." (Id. at 286.)
9       After plaintiff discontinued antibiotics, a knee infection flared and he underwent
10 surgery on January 10, 2002 to debride the infection. (Tr. at 220.) Plaintiff was discharged on
11 January 12, 2002, without incident. (Id. at 219.)
12       A February 28, 2002 x-ray of the right knee indicated a more prominent
13 destructive lesion of the left posterior femoral condyle than was observed on prior examination.
14 Infection or neoplasm could not be excluded. (Tr. at 208.) There was mild medial compartment
15 joint space narrowing with small osteophytes and mild subchondral sclerosis consistent with mild
16 osteoarthritis. (Id.) On April 11, 2002, an x-ray of the right knee showed a destructive lesion
17 within the posterior medial femoral condyle consistent with an infection. (Tr. at 209.) There
18 was no significant knee effusion and no significant change since February 28, 2002. (Id.) Exam
19 at this time revealed a very stiff knee, with a recommendation for aggressive physical therapy.
20 (Id. at 207.)
21       On June 13, 2002, an x-ray of the right knee was consistent with septic arthritis.
22 (Tr. at 206.) The joint space was relatively preserved, but there was a small joint effusion that
23 was difficult to exclude. (Id.) On this date, Dr. Kim wrote to Dr. Beck, explaining that plaintiff
24 was ambulating much more comfortably since his right knee debridement. (Tr. at 203.) His
25 progress with physical therapy had plateaued and was discontinued. (Id.) He hoped that plaintiff
26 would gain a few more degrees of flexion in the knee and recommended follow up x-rays every

1  six to twelve months to ensure there was no additional bony destruction which might indicate
2  recurrence of infection. (Id. at 203-03.) Dr. Kim also noted arthritis in that knee, and thought
3  that plaintiff might undergo knee replacement surgery at some time in the future. (Id. at 204.)
4         On June 20, 2002, Dr. Orellana, an infectious disease specialist, noted that right
5  knee was the only extrapulmonary site which contained the infection.[3] Plaintiff had undergone
6  knee surgery, and was doing well; however, he did not have full flexion in the right knee. (Id. at
7  234.) There was no fluctuance, tenderness, drainage or cellulitis. (Id.) This specialist advised
8  plaintiff that he would probably need therapy the rest of his life. (Id.)
9         Dr. Miller is the only physician to render an opinion on plaintiff's functional
10 capacity. At the October 4, 2002 evaluation which included plaintiff's medical records, plaintiff
11 reported that his knee was stiff, painful and weak. (Tr. at 273.) This orthopedic surgeon found
12 that range of motion in all areas was normal, except for the right knee for which there was
13 flexion at 95 degrees and extension at 3 degrees. (Id. at 276.) Plaintiff performed flexion and
14 extension with pain, tenderness, and increased heat. (Id. at 277.) Neurological exam revealed
15 flexion and extension of the knees at 1/5 where normal was 5/5. (Tr. at 278.) Dr. Miller noted
16 right knee and tibia inactive infection and "questionable valley fever," resulting in limited
17 function of the right knee and arthritis secondary to the infection. As a result, he opined that
18 plaintiff could lift and carry 15 pounds, push and pull 20 pounds occasionally, and stand and
19 walk two hours a day on a noncontinuous basis. His climbing, squatting and kneeling were
20 severely restricted. Other movements not involving the right knee were not restricted. (Tr. at
21 279.)
22        Therefore, the only physician to evaluate plaintiff's functional capacity was not an
23 infectious disease specialist but an orthopedist, and not familiar enough with coccidioidmycosis
24 to give a firm diagnosis. As a result, plaintiff's functional capacity was based only on this exam

---

[3] The record indicates no pulmonary involvement and plaintiff makes no claim on this basis.

7

and not on plaintiff's prognosis, condition during active infection, or pain limitations as a result of this infection.  More importantly, Dr. Miller did not have the benefit of more recent medical evidence submitted at and after the hearing including laboratory reports which indicated a change in the data.  See Tr. 281- 320.

Added to this unclear record is a more recent report from Dr. Kim who examined plaintiff on January 30, 2003 and noted additional findings including an x-ray of the right knee indicating linear density "at the lateral joint space compartment, most consistent with chondrocalcinosis."[4]  (Tr. at 319.)  Dr. Kim also compared this x-ray to the previous one, dated June 13, 2002, noting "slightly more sclerosis surrounding the erosive changes.  No definite radiographic evidence of a joint effusion identified."  (Id.)  It is difficult to determine from this report whether plaintiff's condition has deteriorated more recently, or whether he has a new impairment to be addressed.  Although the ALJ summarized it in his findings, he appears to have given it little consideration.

More importantly, the hearing transcript indicates the ALJ should have obtained specialized medical advice on plaintiff's functional capacity.  As plaintiff points out, the ALJ admitted that he did not understand the significance of certain medical records.  For example, the ALJ at hearing refers to a coccidioidal serology report dated February 5, 2003 which states, "The enclosed serologic report is being mailed without the usual interpretation as Dr. Pappagianis is out of town."  (Tr. at 303.)  Another report, dated April 30, 2003, is mentioned by the ALJ, and similarly states that it was being mailed without Dr. Pappagianis' interpretation.  (Id. at 299.) The ALJ also refers to a new exhibit received that day which is a coccidioidal serology report that gives the following interpretation: "The coccidioidal complement fixation titer of the serum of 18 Oct. 2002 is a shade lower than that of the serum of June 2002."  (Tr. at 308.)  The ALJ's

---

[4] Chondrocalcinosis is the presence of calcium salts in the joints.  When it is accompanied by attacks of goutlike symptoms, it is known as pseudogout.  Dorland's Illustrated Medical Dictionary 262 (26th ed. 1985).

reaction was, "I don't have the foggiest idea what any of that means, do you, Counselor?" (Tr. at 29.) The ALJ concedes that the numbers in the data are lower but he stated, "I don't know what that means and I'm not going to venture to guess as to what it means. (Id. at 30.)  In response to counsel's argument that his pain significantly limits plaintiff, the ALJ responded: " – if the objective findings of the severity of the infection were known, that would certainly shed more light on the objective factors contributing to the subjective complaints but I don't know the answer to the question because nobody –"   (Id. at 30.)   Even the ALJ admits that the consultative exam was "way back in October of 2002," not too long after plaintiff's surgery, implying that the newer reports might indicate a change in the degree of pain experienced by plaintiff, but that it was a question for a doctor, and not within his purview to answer. (Id. at 31.) He went on to explain that he didn't have any doctors present to tell him "how severe one would expect the symptoms to be within reasonable medical certainty based on these objective findings." (Id. at 32.)   The hearing continued:

> ATTY: Right. And I think all we need to the answer is of some degree could be –
>
> ALJ: Maybe that's good enough for you, Counselor, but it's not good enough for me.  I need a doctor to tell me that.
>
> ATTY: No, I agree that a doctor should make a determination as to whether or not some degree could – would be reasonably expected and we don't have that other than this –
>
> ALJ: And we don't have that.

(Tr. at 32.)

       The ALJ and plaintiff's counsel then continued to discuss how the consultative examiner had not reviewed the latest reports indicating a lower complement fixation titer number including records received at the hearing (Exhibits 9F and 10F). (Tr. at 32-33.)  Later, the ALJ stated that he could not "make heads or tails" of the April 30, 2003 report, and in regard to the specifics of that report, he said, "well, I have no idea what that means." (Id. at 34.)  Finally,

9

1  based on the difference in numbers in the October 24, 2001 report reviewed by Dr. Miller and the
2  April 30, 2003 report not reviewed by him, the ALJ stated that he did not know if the difference
3  was slight or not and whether it made a difference to the decision in the case, but that he would
4  have to "go back on the record with a doctor" regarding these differences, and could not make a
5  valid decision in this case until these questions were answered.  (Tr. at 35-36.)   He then
6  wondered aloud what kind of doctor he should obtain to testify as to the meaning of these more
7  recent reports.  (Id. at 36-37.)  He then concluded this area of discussion by stating that he would
8  cross that bridge when the time came.  (Id. at 38.)

9  Based on the ALJ's admitted lack of knowledge about how to decide plaintiff's
10 claim of disability, the case must be remanded for medical review and opinion regarding
11 plaintiff's functional capacity based upon all the evidence, including that submitted after the
12 hearing.  The undersigned is not intimating that it believes plaintiff to be disabled.  While
13 plaintiff's knee injury was, and is, very real, it is questionable that plaintiff cannot perform
14 sedentary work.  However, the undersigned has the same questions the ALJ verbalized at hearing,
15 and those questions must be answered.

16 Plaintiff's claim of error in regard to the ALJ's credibility analysis will not be
17 addressed at the present time.  On remand, the ALJ should reassess plaintiff's credibility based
18 on a more complete record.

19 CONCLUSION

20 If additional administrative proceedings would remedy the defects in the decision,
21 remand is appropriate.  Salvador v. Sullivan, 917 F.2d 13, 15 (9th Cir. 1990); Barbato v.
22 Commissioner of Social Security Admin., 923 F. Supp. 1273, 1277-78 (C.D.Cal. 1996).  The
23 court concludes, as did Barbato, that this case should be remanded for further administrative
24 proceedings to enable the ALJ to obtain a more complete record, and to avoid the possibility of
25 an inequitable result.  Nothing the court has stated herein should be taken as an opinion that
26 plaintiff is, in fact, unable to work at any level.

1 In sum, the court finds the ALJ's assessment is not fully supported by substantial evidence in the record or based on the proper legal standards.  Accordingly, for the reasons stated herein, the court recommends that plaintiff's Motion for Remand or Summary Judgment be GRANTED IN PART, the Commissioner's Cross Motion for Summary Judgment be DENIED, and judgment be entered for the plaintiff.  This matter should be remanded to the Commissioner pursuant to sentence four of 42 U.S.C. §405(g) for further findings in accordance with these findings and recommendations.

These findings and recommendations are submitted to the Honorable William B. Shubb, the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within ten days after being served with these findings and recommendations, the parties may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: 1/12/06

/s/ Gregory G. Hollows

_____
GREGORY G. HOLLOWS
U.S. MAGISTRATE JUDGE

GGH/076
Santiago2481.ss.wpd